Mr. Krishnan. Good morning and may it please the court. My name is Meera Krishnan and along with my colleague Elizabeth Angelone, I represent the appellant A. A. as parent, guardian, next friend of K. K., a minor individual with a disability. As a preliminary matter, my colleague will be addressing the arguments related to the student's functional behavioral assessment and behavior intervention plan. The district court committed clear error in finding that Northside Independent School District procedurally and substantively complied with the IDEA and that Northside Independent School District provided the student with a free appropriate public education or a FAPE. The student in this case has documented mental health disabilities and academic deficits. However, in terms of cognitive functioning, he is average, meaning that he has an average ability to learn when provided with appropriate supports and services to address his disabilities. The student was found eligible for special education and related services in 2012 when he attended Kline Independent School District. At that time, he was placed in Kline's Therapeutic Education Program, which is a placement for students with severe behaviors and was provided with an IEP that provided him with a long list of related services, including but not limited to counseling and psychological services. The student enrolled in Northside Independent School District in 2015. At that point, Northside declined to approve the evaluations of the student, but then moved the student to a regular elementary school campus and effectively stripped the student's IEP of all related services. Though this is outside of the relevant time frame, I present this information as context to show that in terms of related services and getting those services from NISD, the student was effectively starting from zero. The district court committed clear error in finding that the student violated the IDEA. The district court reviewed the record and identified only one technical procedural violation regarding progress reports. However, the district court did not appear to consider appellant's arguments regarding Northside's delay in timely re-evaluating the student for specific related services and Northside's change in the student's placement specifically in April 2017. Did the hospitalization of KK play a part in the delay that you're complaining about? No, not in terms of the three services that we specifically briefed. Related to speech services, the parent initially requested the evaluation of student for speech in February 2016 before the student was hospitalized. At that time, the district declined to conduct the evaluation and stated that it needed to collect data regarding the need for services through the response to intervention process. Parent renewed her request in September 2016 and the district was able to conduct the speech evaluation at that time before the student was hospitalized. For counseling, the same. NISD was on notice that the student required counseling when he enrolled in 2015 because he brought an IEP with him that had counseling services in it. Parent requested evaluation for psychological services in September 2016 along with the other evaluations that she requested at that time. The district convened an ARD meeting in October 2016. She renewed her request for counseling then, but they did not conduct the evaluation for counseling services at that time even though they conducted evaluations in a number of other areas and were able to complete those evaluations before the student was hospitalized. So, then the student was hospitalized in November, December and January and they still did not conduct the counseling evaluation until April of 2017. So the student's hospitalizations perhaps... I have needed a time frame from the time he got out of the hospital until the evaluation. Is that unreasonable? Appellant's position is that the district should have re-evaluated the student for counseling services between on parent's request in September 2016. So that should have been the trigger and he was not hospitalized at that time and Northside was able to complete evaluations in a number of other areas before his hospitalization in November of that year. So, the IDEA does not specify a timeline for re-evaluations. We would argue that the timeline would potentially be commensurate with the timelines for an initial evaluation in this instance because in this case it's services that the student was not receiving. He had not been evaluated for those services by Northside and he was ultimately found eligible for all of those services meaning that when they delayed evaluating him in those areas, they denied him services to which he was entitled and which he required in order to receive a free appropriate public education. And then relating to the dyslexia services which is a different sort of delay. In that case, the parent... that was one of the evaluations that the parent requested in that September 2016. She requested evaluation for a specific learning disability and dyslexia is considered to be a reading disability within the definition of specific learning disability under the IDEA. However, Northside has apparently two separate evaluations, one for specific learning disability, one for dyslexia. They did the evaluation for specific learning disability in a timely manner. We have no dispute with that. However, the student scored low in corresponding cognitive and academic weaknesses that are all indicators of dyslexia. And instead of relying on those evaluation results that he had a specific learning disability, namely dyslexia, they discounted their own evaluation results and said that the student's poor performance was because of his other disabilities, namely his behavior. And as a result, they did not find him eligible, did not provide him with specialized reading instruction or dyslexia services. It was only again in April 2017 that they conducted their specific dyslexia evaluation. And at that time, he scored commensurate with what he had scored in September or October, November 2016 when they had done the SLD evaluation. And that time, they found that he did in fact have dyslexia. But our argument in that regard is that he should have been found eligible to receive dyslexia or reading services on their first evaluation for an SLD. They should not have discounted their own evaluation results. Is it feasible that he was not suffering from dyslexia initially? That time period then resulted in the dyslexia becoming more apparent? I do not think that it's reasonable. The student's reading deficits had been noted as early as 2013, even before he had enrolled in Northside Independent School District. The parent... At the other school? Yes, at Kline Independent School District, they had started tracking his reading progress as all schools in Texas do and had noted that his progress in reading was slow. His progress in reading remained slow while he was in Northside. He was noted to struggle greatly with reading and writing to the point of having aggressive outbursts when asked to write. He couldn't even write his last name when he was starting fourth grade. And that was what prompted parents to request the evaluation in the first place. So, I don't believe that dyslexia is a condition that you acquire later on. I believe, you know, a specific learning disability... If you didn't acquire it, it would become more manifest. I believe that the student's struggles with reading were fairly well documented and that coupled with the parent's request, coupled with the fact that he scored so low on the specific learning disability evaluations, all of those things should have triggered either a finding that he had dyslexia based on those November 2016 evaluation results or the additional dyslexia evaluation that NISD did not conduct until April of 2017. And I would like to briefly in my remaining one minute discuss the student's lack of non-academic progress in terms of his behavior. The district court found that appellants had not met their burden under the Michael F. Factors to demonstrate that a substantive violation of the IDEA had occurred. Specifically, in terms of a non-academic benefit, I believe the preponderance of evidence in the administrative record shows that the student's behaviors, specifically his task refusal, sleeping, and aggressive behaviors, continued both before and during the relevant time period without any meaningful improvement, which is the standard. It is not just any sort of improvement. It has to be a meaningful academic benefit or non-academic benefit in this case. And especially when it comes to the teacher's statement, which the district court relied on, stating that the student could be successful at a traditional campus, the ARDC actually disagreed with her at that meeting and decided to keep the student at the Holmgreen Behavioral Campus, which shows that they did not believe he had made meaningful non-academic progress. So where's the child now? I'm sorry. No, no. Where's the child now? Well, as we mentioned in our briefing, as a result of the student's deteriorating mental health conditions, the parent had to seek the assistance of the Department of Family and Protective Services to gain mental health treatment through a refusal to accept parental responsibility. She remains a managing conservator of the child, but the child has actually been So no longer lives at home? No, he no longer lives at home. Thank you. Because I had a similar question, but this question sort of bears on it. In light of all the circumstances, I know what you've argued to us, but what's the ultimate relief you want? Do you want, let's assume for the sake of argument, we determine, you know, consider all this evidence, or consider all these factors that are laid out in light of where the child is, or are you seeking just a declaration of law that under FAPE, you know, blotty, blotty. I mean, I know that you, your firm, I think you're involved in the case tomorrow. I mean, there's a lot of these cases, so there are issues of what does the Fifth Circuit say about these things, but on the other hand, we take every case as its own case. So my specific question is, in this instance, given this, the child has a multiple of deficits, overlapping, you know, interspersing, et cetera. I mean, it's a tragic set of circumstances, but my cut line is, I mean, at the end of the day, assuming we were to find, I'm not saying we are, but it was unreasonable. I mean, where does that get you? An opinion in terms of all that went forth, or just saying, well, we think the delays on balance, all this was unreasonable. We remand to the district court for further proceedings. I mean, what would that mean? Well, the relief that we're seeking specifically in relation to the delay of evaluation issue, which it would be compensatory services, which could still be provided to the student. He has not aged out of special education. He is still able to be provided with services he's receiving. Yeah, but then I ask, well, is that, you know, something you put here, is that something within our plenary authority to do, versus, you know, if we say, okay, it's unreasonable, but we remand to the district court to consider all of that, along with other circumstances. I mean, I'm not just asking sort of an empty question. Right. I believe that compensatory services are within the provenance of this court to award. They are a commonly recognized remedy under the IDEA. We are seeking remand on the functional behavioral assessment and BIP issue, which my colleague will address. Right, but I guess I'm saying, did you specifically plead to us? I mean, it's been a while since I've looked at all this, but I'm just saying, as part of your notice of appeal to us, et cetera, to end it today, to say, you know, you want affirmative relief or compensate us to order affirmative relief to, you know, to him. You follow what I'm saying? Yes. I'm saying if you ask that, that even if it's there, would it be within our purview in this appeal to do that? I believe that it is within the court's purview under the Burlington Standard, and I believe that the court is empowered to craft an appropriate remedy based on the student's changed circumstances. Yeah, but I just don't know how we're going to know what that is in order to do it. Anyway, I just wanted to get that out, and obviously the other side will have a chance, you know, to start off with it, but just to kind of know where at least thinking here is of, you know, what does this mean because of the changed situation, where the child is and so forth and all that that has occurred. I'm sorry, go ahead. You didn't know. I was just going to say, if the child is institutionalized, what compensatory services would be of value or even be probable at this point? Well, the child is not fully institutionalized. He resides at a residential treatment facility, and I believe that he is also, his biological father also has some visitation as well. He's slowly transitioning out of that setting, but in terms of the educational component, he is still attending a public school district. He's still receiving educational services at a public school district. So isn't that compensatory services? No. Compensatory services are services that should make up for what the child was entitled to but did not receive. So compensatory services can be ordered above and beyond what the student is receiving in his current placement. But it has to be reasonable. I mean, if he can't cope with the basics, how is he going to cope with some supplemental compensatory services? I just think you're asking for something that's not real. Well, actually, if you look at Dr. Doan's report, which was admitted as additional evidence by the district court, the student has actually stabilized in his current placement. Our argument is that the student, if he's given the appropriate behavioral supports and services in the educational context, can learn and can make educational progress. He just needs those supports behind him to address his behavior. So he has now stabilized in his current placement. He was able to be successfully evaluated by Dr. Doan. She determined that he had, in fact, made behavioral and academic progress. So because he's stabilized, he can, in fact, receive the compensatory services and benefit from them. And the argument is that had he been receiving these services all along, we may not even be in this situation. Okay. All right. Well, you've reserved your about time. Thanks for responding to those questions. So we'll see if we have more. Just go down. Yeah, right. All right. Ms. Angelone. Thank you. Good morning, Your Honors. May it please the Court. My name is Elizabeth Angelone, and the focus of my three-minute argument today is twofold. But before I get to that, I do want to clarify that the Texas Department of Family and Protective Services has recently relinquished their rights to the student, and he has been just recently returned to his father and is attending public school in KDISD in a special education class with supports. Oh, counsel is incorrect? Yes, Your Honor. And this was just a fairly recent development where the Department of Family and Protective Services has returned the child to his parents. Parents or father? His parent. I'm sorry, his father. Back to the focus of my argument. Because the NISD determined that an FBA was required in order to develop an appropriate IEP for this child, the FBA then became an educational evaluation under the IDEA. The District Court committed clear error in failing to determine the appropriateness of that FBA under the IDEA's general evaluation procedures and under industry standards. The Behavior Intervention Plan is a significant component of this child's IEP. The District Court erred in determining that the BIP was reasonably calculated to enable the child to make progress. I'm sorry, he failed to determine that, and he failed to address whether the BIP comported with the four Michael F. factors endorsed by this Court. Appellant asked this Court to remand on these two issues for an appropriate analysis. While the District Court was correct that an FBA is not required under the IDEA, except in the context of a disciplinary removal, because the NISD determined it was necessary in the development of an appropriate IEP, it became an evaluation, and NISD had a duty to conduct that evaluation appropriately. The Court failed to address that issue. The District Court found only that the FBA was appropriate because it was similar in breadth and depth to the prior District's FBA, which is not the standard under the IDEA's evaluation procedures or in determining the appropriateness of an evaluation. Additionally, the District Court committed clear error in determining that the BIP was appropriate merely because it followed a formed document when NDIRF tells us an IEP is not a formed document, it had supplementary commentary without regard to the appropriateness or relevance of that commentary, and finally, the District Court erred in determining the BIP was appropriate merely because the parent participated in the underlying evaluation, which cannot be the standard. The District Court committed clear error in its failure to appropriately analyze the FBA as an evaluation under the IDEA and committed clear error in failing to address the appropriateness of the BIP as a component of the IEP under the Michael F. Factors endorsed by this Court and as predicated by the NDIRF. And I am out of time. All right. Thank you. You packed a lot in three minutes. Thank you. All right. Let's hear from the school. Ms. Castillo. May it please the Court. I am Stacy Tour-Castillo. I represent Northside Independent School District in this case. I want to start by pointing out the appellants have raised several issues that are beyond the statute of limitations period. In special education cases, the statute of limitations is one year. The due process hearing was filed on May 12, 2017. Therefore, the relevant period in this case is May 12, 2016 to May 12, 2017 and ongoing. I also want to highlight that the IDEA focuses not on labels. So we don't focus on the label that's given to disability, the label that's given to the services. We're focused on what the appropriate educational services were for this child, what his educational needs were, how he was serviced, how the services were implemented, and how he was performing. I want to turn to the re-evaluation issue. The statute and the regulations do not provide any timeline for re-evaluations other than a re-evaluation is required at least once every three years and no more than once every year. A re-evaluation would arise if the district determines that the child's educational needs warrant looking at them again or re-evaluating those needs or if a parent requests a re-evaluation. They claim that parent requested re-evaluations for speech, counseling, psychological, and dyslexia. And I want to focus my time right now on those particular requests and how the district responded to them and how they were evaluating the child's needs in those areas. Specifically on speech, they first started talking about February 2016. Again, that is outside the statute of limitations period. So if we focus on the relevant time period, the parent first requested speech evaluation September 29th, 2016. The district met less than two weeks later to discuss that request and approved that evaluation and began that evaluation that month, met the following month to approve and review the evaluation for speech needs and included that in the student's IEP. There was no delay in the speech evaluation. For psychological and counseling, psychological and counseling was first requested by the parent in, the psychological was requested at the end of September and counseling was raised at the ARD in October 2016. And at that ARD meeting, the counseling, when you read the minutes, the counseling was brought up by the district representative. The district representative offered counseling but said we need parent consent for a counseling evaluation. And the ARD minutes don't reflect that the parent provided consent. And instead, the minutes reflect or that the parents in the ARD committee discussed emotional behavior assessment. And that is what the district assessed the child on, emotional behavior. And emotional behavior, again, this will go back to not worrying about what labels are used on things. An emotional behavior assessment would necessarily bring up things that would entail counseling-related services should those be necessary. They agreed to this assessment. It was conducted in October with the results coming out in November. The emotional behavior assessment identified two specific needs for counseling, which were coping skills and decision-making skills. Those were identified, targeted interventions were developed, and strategies related to that. I want to point out they keep raising Cline ISD's IEP before he came to Northside and Cline ISD's IEP since he's left Northside. Cline ISD's IEP is not the standard. When you're looking at an IEP for a child, you're looking at did the district individualize the assessments for this child, individualize his IEP addressing his specific needs, which the record shows the district did do. But even if you look at Cline ISD's IEPs and you look at what they had for counseling-related services, you will see they were targeting coping skills and decision-making skills. And they were using social skills training. And there's testimony in the record from our social skills training that we were providing to the student. And those social skills training skills were teaching him how to cope, how to deal with frustration, how to use emotional vocabulary, how to use calming techniques. All of those social skills that we were providing in his classroom setting, Cline ISD, they were using it as counseling-related services, using a different label for it. But these are the same skills and the same type of interventions we were using at Northside ISD. So the timing for the counseling, again, raised October 20th by the district. There's nothing in the record that the parent provided consent at that time. But we did conduct an emotional behavior assessment, addressed those in his IEP, looked at teacher observation and teacher reports. The teachers were not reporting that they were not reporting seeing similar behavior that mom was claiming was happening at home. And that is difficult to address when you're in the school setting because at the school, the teachers are reporting that he did not have any uncontrolled misbehaviors and that they were able to redirect him with one or two prompts and that he was able to calm himself down using the skills he was learning through his social skills training. So there was not a need that was evidencing itself requiring anything more than the district was doing at that time. And importantly, when you look at Klein ISD's notes and their independent evaluation they had after he left Northside, the teachers at Klein are reporting the same thing. They're not seeing uncontrolled misbehavior in the classroom and he's redirecting with one to two prompts. Those were the same thing Northside was experiencing in the classroom. Now, that being raised October 20th, he was hospitalized early November. And this is important because during that hospitalization period from November to January, he was serviced by Kai Charter School which was separate from Northside ISD. And being serviced by another school while he's hospitalized changes the dynamic when he's returning to Northside at the end of January. Why was that? Because when he transfers from one district to another, the district is required to put in place for those first 30 days of his return a transfer IEP where we provide comparable services to what he was receiving at his prior placement. And that is what we did from January to February was offer the comparable services he was receiving at Kai Charter School. And then at the end of February and beginning of March is when he was the district's reassessing and reevaluating the IEP, his FBA, his behavior intervention plan. And at that time the LSSP said, let's talk about counseling. Can we get consent for a counseling evaluation? We got consent for the counseling evaluation, began at that month, and at the next ARD meeting added counseling as a related service to his IEP. And I do want to point out that counseling as a related service in special ed terms, that's not therapeutic counseling. That's directed towards helping him and assisting him achieve his IEP goals. And when you look at the counseling evaluation that was completed by Northside, you'll find that they identified the same interventions that were necessary that they identified when they did the emotional behavior assessment, which were his needs were coping skills and decision-making skills. And in the counseling assessment, the counselor, the LSSP that was doing the evaluation noted that the behavior interventions they were doing in the classroom and the social skills training were providing him benefit. But counseling would be beneficial to him. There was not a finding that it was warranted or needed, but it would be beneficial, and they added it to his IEP. Concerning the dyslexia, MOM requested a learning disability evaluation at the end of September. We conducted it in October, but they found that there was no learning disability at that time. As y'all noted earlier, this child does have severe behavior needs and emotional needs, and testing is notoriously difficult with this child, not just in the school district environment, but they have the same issue when they've used outside providers. There have been times they've not been able to complete the evaluation because the student simply can't complete the evaluation. It was not raised again until March 2017 for dyslexia testing, and as soon as she requested it, the district agreed and began assessing him for dyslexia. They completed that evaluation in April, and ARD wanted to review an independent evaluation in conjunction with the one the district did to compare the because the child was not cooperative. Not having the IE to compare it with, the district went ahead and said, we're going to go ahead and provide dyslexia services because some of this testing was inconclusive. We're going to provide the services, which they did. So the delay with dyslexia is easily explained looking at how the district, they evaluated him for a learning disability initially. They did it again for dyslexia, and the results were difficult to read simply because the child doesn't perform well in the assessment environments. And the case law is specific on the failure to diagnose at the earliest possible moment is not a per se actionable, in part because disabilities are so notoriously difficult to diagnose, and dyslexia is one of those, especially with a child with these found that there was an unreasonable delay or procedural error in this case. The next step is to determine whether those procedural errors denied the parent participation or impeded the student's FAPE. And the record is clear this child was provided FAPE while he was enrolled at Northside ISD. The court still uses the Michael F factors in determining whether FAPE has been provided, that is whether the IEP was individualized on the basis of FAPE. And the case law is replete with the various assessments done multiple times for this child. And in his fourth grade year, that 2016-17 school year, the ARD met no less than 10 different times. Let me ask you a question. Yes. Don't we have here a period in which I guess admittedly the student was in decline as far as, you know, functioning, ability, I mean, where it starts going that way. Downward, I thought a part of the gravamen of the complaint was, of course, unreasonable and the delays, but isn't there a point in time, and I'm asking this because you started off about statute of limitations, so I'm trying to hone in on what's the zone that's sort of actionable for our purposes of things that, you know, are viewable or not. So my question is, is there an indisputable point in time where the student was admittedly in decline from, you know, whatever, decline or your district or whatever, but starts spiraling downward to where, you know, adjusting the FAPE or whatever was required, and that's sort of the gravamen of the complaint, or is it the school district's view that for the most time, you know, we just kind of got a flat line, you know, sort of like that? You understand what I'm asking? I do. The record shows that he was making progress commensurate with his disabilities. When you look at the record and you take each of his academic goals, each of his non-academic goals, see what the goals were from the beginning and how he was progressing and meeting them. He was progressing, and the ARD committee would change those goals to layer on top of it to have him improve step by step. Now, in general, you know, he's in fourth grade. He is reading below level. He is struggling with the writing component, but the IEP goals are written specifically for him based on his abilities and have him as a stepladder improving at each different level as they assess it. For instance, in reading, in this relevant time period, he did have measurable progress in reading that the teacher said was reflected more than a year of progress. He went from reading at level C to reading at level J, which the teacher said was more than a year of progress in a one-year period. And in math, it was the same thing. They had specific goals in each area of math where he was doing simple addition, progressing to word problems, progressing to double digit subtraction and addition. Well, I had read, and maybe I'm confused because we've got two cases, but that part of it, and I'm not trying to oversimplify it, but part of the complaint of the parent in terms of unreasonableness was that there was a period in time in which the student kind of went in decline, a spiraling downward, and that this delay in affording the services, whatever they were, exacerbated the decline such that the FAPE was not commensurate with the service and inciting the cases, injury, et cetera, saying, well, the FAPE has to be there. Again, I'm not trying to oversimplify it, but trying to... I could tell you just... Is that true or not? That is not what the record reflects. Okay. All right. The record does reflect progress also as well as in behavior. In behavior goals, if you start at the beginning of the time period, he was having at least four incidents of physical aggression in a 30-day-plus time period, and by the end of the period, he was only having one in that same time frame. Did the hospitalizations result from, quote, decline, or did they result from something other than what might be called... No. Obviously, that's what they claim, but that we were not... The behaviors that resulted in hospitalization were behaviors that were occurring in the home environment, not at school. Okay. And like I had said earlier, that the behaviors that mom's reporting happening at home, we were not seeing at school. We were watching for them. We had plans in place to deal with them. We were teaching him coping skills, teaching him decision-making skills, teaching him how to lower frustration level, removing yourself from a situation when you're frustrated, but the behaviors that ultimately resulted in his hospitalization occurred at home and were not replicated at school. What's your position on the request now that the child's been returned to his father, that there be compensatory services? What does that mean to you? Well, I understand the compensatory services they're requesting. If they're saying he was denied two months of counseling, they're asking for the district to pay for two months of counseling. Whether this court should remand it to the district court or whether it's within your province to craft that remedy, that would be something I would have to brief the court. I'm not able to answer that right now. And were the two months the time period when he was hospitalized? Are you talking about September to... They've kind of got different ranges. Part of it is the hospitalization. They're claiming that because they claim we weren't providing counseling, but we were providing social skills training, which I was saying I encourage you to look at the client ISD IEP that they claim they had counseling as related services, because those social skills were being taught in his classroom at the district. At the district, he was in a self-contained behavioral unit with one-on-one instruction, and he was providing... Those supports were provided in the classroom. So where is he now? Does he go to school? From my understanding, I don't have any evidence concerning it. I just know from counsel what they said today that he's currently... They just want to find out what they want. Right. And where he is or whether he's getting counseling. I mean, nobody seems to know the answer to this. That I don't know. Okay. Thank you. So is the status quo, your school district now doesn't still have any contact or responsibilities that are going on now? Everything we're talking about here is sort of what has transpired. Correct. Everything we're talking about today is the 2016-17 school year, and that's it, because after 2017, he moved to a different school district. So the relevant period for our inquiry is the May 12, 2016 to May 2017? Correct. And in that time period, he was hospitalized at a different school from November to January. So we don't know what he's getting, so we don't know what to order or what to respond to. Okay. I'd say no. Well, after the court reviews the record, I feel strongly that you'll find, as the hearing officer did at the special education hearing, that the student was provided FAPE at all times. The district court found the same thing, and I asked the court to find that the child was provided FAPE at all times and affirmed the district court's decision. Well, let me just ask you. Yes. Let me just spin off. The question I asked him, assuming arguendo, not saying will. Right. Assuming we were to find unreasonableness within this time period, and that's all we found, that the delays were unreasonable, blotty, blotty, whatever the labels, such that the FAPE was not adequate for services, and we remanded the district court with some language. What would that mean in terms of your district? Because of where the child is now, I mean, would that be meaningful, or is that just triggering the question of whether the district court could order compensatory services that you, not you personally, would have to do, though you're not now have custody, for want of a better word, with the child. Do you follow my question? Well, the way I understand how the compensatory services would work, for instance, let's say, assume it's counseling. The district, if we were found liable, would be responsible for whatever time period the court found he should have been provided counseling and wasn't provided counseling for that specific time period. We'd provide either at the district with our counselors, and he'd have to come here, or we would pay for a counselor at his current setting. Well, I ask that question for the reason, but also, we had asked both sides to, and you both did, file your letter briefs in terms of the child fine provision based on Spring Branch. Both of you say the child fine provision is not applicable because here the child is already identified, but in Spring Branch, what the panel sent back was the remedy. I mean, they reversed on the remedy part, which sort of gets to where we are in this case of assuming something, like what is the remedy? That's what they sent back. Now, there's a pinky in the case and all of that, so I don't know, but the question is, beyond the child fine that you have addressed, is there anything in Spring Branch that helps us, or that's similar to what's going on here? I did not find that to be the case. I think when you look at the speech services, they were provided and evaluated right when she asked it. Counseling, we had the hospitalization that was the interim between the discussion of it and when he returned. There was not a gap. Well, I ask, as I said, not rhetorically, because putting aside the child fine, part of the struggle the panel has, you know, is the remedy, and sending it back, you know, and I didn't see what's been argued here, that the panel, or we, sort of have plenary authority to just kind of cut an order saying, do A, B, C, and D is sent back down, which to me in this case would be to the district court. Again, I'm not saying that's what we do, but we're just trying to think through the process of what we're being asked in this case under these circumstances beyond just waxing about what the child is, and we're not going to have a child who's no longer in the arena, so to speak, and like that, it just seems to kind of make a difference with where, you know, where we are. I'm not talking about mootness or whatever, but we don't want to be in just an academic exercise of opining when it doesn't make a real difference in what's going on, but that's why we ask, and I appreciate the answers you've given. And if the benefits court have a supplemental brief on that issue, I'm happy to do it. It may happen. We'll see. Take all the help we can get. Thank you. All right, Ms. Christman, you're back up. Regarding the issue of counseling versus social skills services that counsel was speaking about a few minutes ago, I'd like to offer some clarification on that issue. The record actually shows that even when the student was supposed to be receiving group social skills instruction in his regular classroom, the district actually substituted speech therapy for some of those social skills sessions because the student adamantly refused to work with his speech therapist outside of the provided these purported social skills services, it's not the same as individually tailored counseling that would have addressed the student's specific individual needs. Was what you were seeking initially for this school district to adopt and do precisely what the Klein district had been doing? No. That is not what we were asking the court . . . what we were asking the district to do. At the due process level, when the due process hearing occurred, the student had not yet moved to Klein ISD from my understanding. He was still enrolled at Northside. But again, I would have to verify the exact dates. But he . . . at that time, we were seeking a new IEP for the student, and I believe we were also seeking the consideration of residential placement for the student because at that time, his behaviors warranted a residential placement, which is And regarding opposing counsel's point that the behaviors that resulted in the student's hospitalization were only observed in the home setting, the record actually shows that the student had these behaviors in the school setting and reported them to teachers who then reported them to parents. So for example, in November 2016, right before he was hospitalized, he went to his general education counselor at school and said that he had hallucinated hurting his teacher with a piece of paper, that he had been drawing stuff like murder, that he needed to speak to a doctor, and he used the phrase, like one you can talk to, because he was nine years old at the time. In addition, he did . . . the record shows that he did self-harm in school on a number of occasions, and his teachers communicated with parents to say that, oh, you know, he carved an X into himself with the metal part of a pencil today, and parents would report back that that's a serious concern because self-harm is one of the events that often precipitated hospitalization. When it comes to the fact that his behaviors were purportedly addressed by the social skills training, the record shows that his disruptive and aggressive behaviors did not result in any real or meaningful improvement, which is the standard during the relevant time period. When he started back at NISD in January 2017, he destroyed the front office and had to be restrained because he kicked and bit a staff member. As the semester continued, the aggressive behaviors continued. He got into fights with other students. He self-harmed, as I said, with other materials, and a lot of the time he was permitted to refuse tasks, so the speech therapy provider would come to the classroom, the occupational therapist would come to the classroom. He would just put his head down and refuse to work with them, and if he was prompted or pushed to work with them, he would then have one of these aggressive outbursts. So the idea that his behaviors were completely in the home setting or not otherwise . . . or that they were addressed under his IEP or his behavior intervention plan is not supported by the record. And in addition to that, appellants argued that his sleeping behavior, which was not addressed in either his functional behavioral assessment or his behavior intervention program, was also a form of task refusal. He was permitted to sleep, and a student who is sleeping cannot receive a I suppose, again, for the sake of discussion, that we found, given you all go tit-for-tat on what happened when and under what label and so forth and all of that, and we say, well, all that was laid out in front of the district court, it's all in there, whatever, whatever, district court found reasonableness and so forth. So you lose here on that, given the status quo, where does that leave you and your client? Just still in the custody of the parent and subject to, I guess, with him starting over? Yes. Where it would leave the client is that he would not receive the compensatory services, so he would not receive additional services in addition to whatever his current school district is providing him. And I do not know the details of the student's current IEP because he was just recently moved back to the custody of his parent in a new school district, but he would be receiving the educational services from that school district and presumably an IEP from that school district. What's the school district he's in now? I believe my co-counsel said he was in KD ISD, which is near Houston. All right, so if he's in KD, even assuming our court or the district court ordered compensatory services, would the order be to the KD ISD to give the compensatory, or we're talking about a monetary? No, the order would be to Northside Independent School District, and as opposing counsel mentioned, there are multiple ways for Northside to provide those compensatory services. How would they do it if the child is now in another school district? Well, as she mentioned, Northside ISD could fund the services, so they could make a certain amount of money available to the parent for the private services, or they could make a counselor available that could travel. We're happy to do additional briefing on this issue, but . . . In the case that you're aware of where what you just said has happened? I am not aware of any off the top of my head at this moment, but we're happy to brief that if the court requests it. All right. Thank you, counsel, for the briefing and argument in the case. The case will be submitted, and we'll give it our best. Stay tuned. We'll see whether or not we think it warrants some additional briefing or not. We'll see. Otherwise, we'll decide. Thank you. Okay. This concludes the oral argument cases for today. The panel will be in recess until 9 a.m. tomorrow. Thank you.